IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 11-00490 WHA |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION TO SUPPRESS** |
| JABAR BABERS, | |
| Defendant. | |

## INTRODUCTION

Defendant moves to suppress evidence obtained as a result of his warrantless detention and arrest on June 26, 2010. After full consideration of the parties' moving papers, declarations, exhibits, the enhanced video-recording of the incident, and oral argument, this order finds that the officers' had reasonable suspicion to detain defendant and probable cause to arrest him. Defendant requests an evidentiary hearing. The order concludes no material facts are in dispute, so there is no need for an evidentiary hearing. Defendant's motion to suppress is **DENIED**.

## STATEMENT

The Court has reviewed all of the submissions made on this motion, including the enhanced video-recording manually submitted with defendant's brief, and makes the following factual findings.

On Saturday, June 26, 2010, at around 12:18 p.m., San Francisco Police Department Officers Alcaraz, Ellis, Ochoa, and Johnson, members of the SFPD's Bayview Station Cease Fire Unit, were working in plainclothes and driving in an unmarked black patrol car in the Bayview

1  district. The officers were on patrol in the area of Garlington and Commer Court, known to them
2  to be a common hangout spot for members of the BNT gang. Officer Alcaraz was driving the
3  patrol car. As he made the turn from Garlington onto Commer Court, the officers noticed a group
4  of seven familiar subjects standing directly in front of 27 Commer Court watching a mechanic
5  working on the engine of a sedan. Officers Alcaraz and Ellis recognized the subjects as Jabar
6  Babers, our defendant, Terell Harvey, James Harbor, Stanley Domino, Damyan Rochelle, Damarr
7  Simmons, and one juvenile, whose name will not be disclosed herein. Officer Ochoa recognized
8  all of the subjects except Damarr Simmons and the juvenile. Officers Alcaraz, Ochoa, and Ellis
9  knew defendant Babers through previous law enforcement contacts. They knew Babers was a
10 BNT member or associate and a convicted felon. Officer Ochoa had eight to ten prior law
11 enforcement contacts with defendant Babers and also knew that Babers was a suspect in a robbery
12 case at the time. Officer Ellis had approximately five to fifteen prior law enforcement contacts
13 with Babers.

14 As they approached the subjects, Officers Alcaraz, Ochoa, and Ellis observed Babers look
15 in their direction and acknowledge their presence. Then, the officers observed Babers place his
16 right hand by his waist line and bend forward, placing an unknown object on the ground in front
17 of him near the front left tire of the sedan and the front right tire of the pickup truck — both
18 vehicles are shown in the video. Officer Ochoa observed the object to be dark in color. After
19 Babers dropped what was then an unknown object, the officers observed him walk away from the
20 area where he had bent over to drop the object.

21 Based on their training, Officers Alcaraz, Ochoa, and Ellis, identified Babers' movements
22 as being consistent with the movements of someone attempting to conceal or distance oneself
23 from contraband. Upon observing defendant's series of movements, Officer Ochoa yelled out,
24 "Did you see that?" Officer Ellis also exclaimed, "Hey, did you see that? Stop the car." Officer
25 Alcaraz pulled the patrol car over near the pickup truck and sedan and the officers exited the car.
26 Because they were in the heart of BNT gang territory, the officers' first priority was to ensure
27 officer safety by pat searching each of the seven subjects. The officers pat-searched each subject,
28 including defendant Babers.

1    After conducting a pat search on each of the seven subjects, the officers walked them
2 away from the area where Babers had dropped the unknown object and directed them to sit on the
3 sidewalk; they were not handcuffed. Once Officer Alcaraz determined the scene was secure, he
4 called SFPD dispatch to inform the operator of their present location.

5    Officers Ochoa and Alcaraz began to search the area where they had observed Babers
6 drop the unknown object. One officer peered into the bed of the pickup truck and reached an arm
7 into it. The officers conducted a search of the area immediately adjacent to the passenger side of
8 the truck where the subjects were located upon the officers' arrival.

9    Within less than two minutes after arriving on the scene and less than one minute from the
10 time the officers began to conduct the search, Officer Ochoa found a Ruger handgun under a
11 detached mud cover lying loose near the curb and adjacent to the pickup truck and car. Upon
12 locating a gun, he immediately called out to the officers that he had located a firearm and the
13 officers drew their weapons. They placed each of the seven subjects in handcuffs. Defendant
14 Babers was placed under arrest for possession of the firearm. Prior to transporting the subjects, a
15 transportation search was conducted. The subjects were then transported to the station for further
16 investigation. The officers did not arrest Mark Phillips, an older mechanic who was working on
17 the sedan, who was not known to have gang ties.

18    Wearing latex gloves, Officer Alcaraz seized the gun and placed it in an envelope and in
19 the trunk of the patrol car. He later retrieved the gun and kept it in his possession. Officer
20 Gregory responded to the Bayview Station and seized the gun to process it for DNA fingerprints.

21    Officers Alcaraz, Ochoa, and Ellis reviewed the video (taken from a nearby light pole) of
22 the incident in question and identified the individual who takes a step forward and bends down at
23 approximately the 12:18:39 mark as Jabar Babers, our defendant.

24    Sergeant Manning took over the investigation once the subjects arrived at Bayview
25 Station. Based on the officers' observations of defendant Babers' actions it was determined that
26 he was in possession of the firearm and he was booked at the Bayview Station on that charge.

27    At approximately 3:30 p.m. on the same day, Sergeant Manning and others, who are
28 unnamed, interviewed defendant Babers and tape recorded the interview without his knowledge.

3

Sergeant Manning mirandized defendant Babers. During the interview, defendant Babers stated that the gun was not his, that he never touched the gun, that he never saw the gun, and that his fingerprints and DNA would not be on the gun. Defendant stated he was outside for seven to ten minutes near the corner of Commer and Garlington, where the officers observed him, and was talking about a party he attended the previous night. Defendant Babers was confronted with the video evidence that shows him bending down, and he denied bending down. Defendant Babers stated that he was murder-victim Carly McFarland's best friend. He also acknowledged that it was possible that he could have put a gun down but stated that he did not. Defendant Babers voluntarily provided a DNA swab.

\*          \*          \*

Defendant Babers was indicted on July 19, 2011, on one count of possessing a firearm after having been convicted of an offense punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. 922(g)(1). Defendant Babers moves to suppress the evidence derived from his alleged unconstitutional detention and arrest on June 26, including, but not limited to: (1) the DNA sample taken from him; (2) all DNA analyses comparing his DNA to the DNA taken from the gun; and (3) all statements made by him to the police on June 26.

**ANALYSIS**

Based on the foregoing findings of fact, this order holds that defendant Babers' detention was based on a reasonable suspicion that criminal activity was afoot and that his arrest was based on probable cause. Thus, the warrantless searches were lawful and the evidence obtained from the searches need not be suppressed.

Defendant argues that there should be an evidentiary hearing, that the officers did not have reasonable suspicion to detain him, and that the officers did not have probable cause to arrest him.

**1.    NO NEED FOR AN EVIDENTIARY HEARING.**

Defense counsel requests an evidentiary hearing, contending that there are contested facts at issue that "form[] the alleged predicate for Mr. Babers' detention and arrest" (Br. 14). A district court "ordinarily is required [to hold an evidentiary hearing] if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that

4

1  contested issues of fact going to the validity of the search are in issue." *United States v. Walczak,*
2  783 F.2d 852, 857 (9th Cir. 1986) (citation omitted).

3  In his opening brief, counsel does not identify specific facts that are contested. Instead, he
4  argues that the video "paints a very different picture of th[e] events than the police report" (Br. 5).
5  Specifically, counsel argues that the video is "less clear on the point on which the government
6  presumably intends to rely . . . that Mr. Babers touched his waist, bent down and put something
7  on the ground," concluding it "is impossible to tell that *Mr. Babers* did anything" (*id*. at 6)
8  (emphasis in original). Further, counsel states that Officer Alcaraz's narrative in the police report
9  is not "clear on the sequence of timing of a number of events" (*id*. at 3 n.5). Finally, counsel
10 points to the fact that Sergeant Manning's report does not mention the pat searches referenced in
11 the police report (*id.* at 4).

12 The government appends the sworn declarations of Officers Alcaraz, Ochoa, and Ellis to
13 its opposition. The declarations and chronological investigation report provide clarity as to the
14 time line of events. The court finds that the declarations themselves are consistent with one
15 another *and with the video*, *ie.*, there is no contradiction.

16 On reply and during oral arguments, defense counsel contended that the officers'
17 declarations "strain credibility" (Reply Br. 1). The Court has carefully reviewed the video and
18 finds the argument unfounded. On reply, counsel makes much ado about the fact that Officer
19 Johnson, one of the officers present at the scene did not submit a declaration, and from this argues
20 that there are inconsistencies between the video and what is stated in the police report that Officer
21 Johnson saw, and that this Court needs to resolve these inconsistencies (*id.* at 2–3). But the
22 police report merely states that Officer Johnson, like the three other officers, at the scene saw
23 defendant Babers touch his waist before bending over and putting an object on the ground. There
24 are no facts to contest this or from which any inconsistency can be drawn. Finally, defense
25 counsel contends in his reply brief and emphasized at oral argument that the declarations are
26 inconsistent with the video, which shows that the police "searched high and low" for the gun (*id*.
27 at 3). But the gun was quickly found within *two minutes* of the time the officers arrived on the
28

5

1 scene, even less when it is remembered that much of that time was used to secure the scene for
2 officer safety before searching for the weapon.

3 The submissions are consistent as to the material facts. The Court finds no material
4 discrepancies warranting an evidentiary hearing. Defense counsel's desire for a fishing
5 expedition does not create a material issue of fact. An evidentiary hearing is not warranted.

### 2. DETENTION.

Defense counsel contends that Babers' detention was unconstitutional because the officers lacked reasonable suspicion to detain him. It is undisputed that the officers had no warrant to detain defendant Babers. Thus, the government must prove that the detention falls within the warrant exception to the Fourth Amendment.

Consistent with the Fourth Amendment, an investigatory stop or detention is permissible if an officer has a reasonable suspicion to believe that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). "If an officer reasonably suspects the individual may be armed and dangerous, the officer may frisk the person he has stopped to determine if the individual is carrying any weapons. *United States v. Johnson*, 581 F.3d 994, 999 (9th Cir. 2009). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002). To determine whether reasonable suspicion exists, the totality of the circumstances should be considered, including reasonable inferences drawn by the officer because of his or her experience and specialized training. *United States v. Arvizu,* 534 U.S. 266, 273–74 (2002); *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010) (stating "The determination is made with reference to the collective knowledge of the officers involved, and the inferences reached by experience, trained officers.") (internal quotations omitted).

The Supreme Court has emphasized that courts must give deference to the inferences drawn by the detaining officers, given his or her experience or specialized training (*Arvizu*, 534 U.S. at 273–74) (internal citations and quotations omitted):

> When discussing how reviewing courts should make reasonable-suspicion determinations, we have said

6

> repeatedly that they must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.  This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.

Thus, even a series of seemingly innocent acts can together form the basis for reasonable suspicion. *Id.* at 274 (noting that *Terry* itself involved a "series of acts, [each] perhaps innocent in itself," but when taken together warranted further investigation).

      Defense counsel contends that mere presence in a high-crime area does not provide officers with reasonable suspicion to detain.  This is true.  By itself, an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).  But, the Supreme Court has emphasized, that considering "the fact that the stop occurred in a high-crime area [is] among the relevant contextual considerations in a *Terry* analysis." *Ibid.*

      Here, the totality of the circumstances show that there was reasonable suspicion to believe defendant Babers may have engaged in criminal activity.  Upon turning the corner onto Commer Court, Officers Alcaraz, Ochoa, and Ellis observed a group of familiar subjects standing and watching a mechanic work (Alcaraz Decl. ¶ 5; Ochoa Decl. ¶ 5; Ellis Decl. ¶ 5).  The officers specifically observed defendant Babers "look in [their] direction and acknowledge [their] presence" (*ibid*.).  Defendant Babers gestured with his right hand in the direction from which the patrol car arrived (Axelbaum Supp. Exh. A).  Within a matter of seconds from the time defendant Babers acknowledged the officers' presence and the officers first observed him, the officers saw defendant Babers "place his right hand by his waist line."  Defendant Babers then bent forward.  And the officers observed him "place an unknown object on the ground in front of him (near the front left tire of the sedan and the front right tire of the pickup truck)."  Then, after defendant Babers discarded the unknown object, the officers observed him "walk[] away from the area of the sidewalk where he had bent over" (Alcaraz Decl. ¶ 6).

7

Together, Officers Alcaraz, Ochoa, and Ellis had a combined total of over twenty years of work in the Bayview district, the area where this incident occurred, and even more years of experience as SFPD officers. Based on their experience in the Bayview district, and their specialized training, the actions they observed defendant Babers' take were "consistent with that of someone attempting to conceal or distance oneself from contraband" (Ellis Decl. ¶¶ 1, 6; Alcaraz Decl. ¶¶ 1, 6; Ochoa Decl. ¶¶ 1, 6).

Adding to the totality of the circumstances was the fact that the officers' observations of defendant's furtive movements — what they believed to be defendant Babers' attempt to conceal or distance himself (a convicted felon) from contraband — all occurred within the heart of BNT gang territory. Indeed, Officer Ellis' observation of these movements caused him to immediately yell out to Officer Alcaraz to "Stop the car" (Ellis Decl. ¶ 6). The officers had knowledge that at least five of the other subjects with defendant Babers were BNT gang members or associates. And the officers knew defendant Babers from multiple previous law enforcement contacts and knew him to be an affiliate of the BNT gang and a convicted felon. In addition, Officer Ochoa knew defendant Babers was a suspect in a robbery case (Ochoa Decl. ¶ 5; Ellis Decl. ¶ 5; Alcaraz Decl. ¶ 5).

Indeed, based on their training and over two decades of combined experience working in the Bayview district, where they encountered our defendant, and viewing the "whole picture," the officers astutely identified defendant Babers' furtive actions as ones giving rise to a reasonable suspicion that Babers had possession of contraband.

Defense counsel makes several arguments urging this Court to conclude reasonable suspicion was lacking. *First*, he contends that if the officers believed defendant Babers had discarded the gun they would have immediately gone quickly to the gun, after exiting the patrol car, and secured the weapon (Br. 7). But, as Officers Alcaraz, Ochoa, and Ellis stated, their first priority, especially in the heart of BNT territory, was safety, and consistent with SFPD policy, they detained the subjects and conducted a pat search (Alcaraz Decl. ¶ 7; Ocha Decl. ¶ 7; Ellis Decl. ¶ 7). Thus, no conclusion that reasonable suspicion was lacking can be drawn from the

officers' compliance with SFPD policy.  Moreover, within two minutes from arriving on the scene, they located the firearm.

*Second*, defense counsel argues that the video is unclear and it is impossible to determine which of the subjects is our defendant.  This argument falls away because in their sworn declarations, the officers identify defendant Babers as the subject who they saw bend down and engage in furtive movements (Alcaraz Decl. ¶ 10; Ochoa Decl. ¶ 10; Ellis Decl. ¶ 10).

*Third*, citing *United States v. Mallides*, defense counsel contends that our court of appeals has concluded that "furtive gestures" do not provide reasonable suspicion.  473 F.2d 859, 861 (9th Cir. 1973).  But in *Mallides*, the furtive gesture was the act of six passengers in a car sitting erectly and not looking at police officers.  Here, there was affirmative action consistent with actions taken by an individual attempting to discard or distance himself from contraband. *Mallides* is not instructive here.

*Fourth*, defense counsel contends that the fact that the officers detained all of the subjects undercuts the fact that they had reasonable suspicion to detain defendant Babers.  But the officers indicated they conducted a pat search of all subjects in order to secure officer safety.  This is consistent with SFPD policy and has no bearing on whether there was independent reasonable suspicion to detain defendant Babers.

*Fifth*, defense counsel argues that even if there was reasonable suspicion, the officers had no right to detain defendant Babers for the period of time they did.  *Terry* instructed that the length and scope of detention must be justified by the circumstances authorizing the detention. 392 U.S. at 19–20.  The officers searched the area immediately around where defendant Babers was located.  It took them less than two minutes to locate the gun.  The scope and length of the detention was justified.

*Sixth*, defense counsel takes issues with various decisions cited by the government to show other circumstances wherein a court concluded that reasonable suspicion was found.  For example, defense counsel contends that the governments' reliance on *United States v. Lopez,* a recent decision by this judge, is misplaced.  2011 WL 855808 (N.D. Cal. March 9, 2011) (Alsup, J.).  In *Lopez*, a finding of reasonable suspicion was based on the fact that defendant gave the

9

officers a startled look when they drove by, defendant was traveling in the same direction where officers knew the suspect to be fleeing and turned to walk in the opposite direction upon seeing the officers, and defendant crouched behind a van. Because "none [of these factors] are present in this case," defense counsel argues *Lopez* has no bearing here (Reply Br. 5). Cases have different facts. Much like in *Lopez,* our defendant acknowledged the approaching officers and changed his course of action and behavior in response to being approached by officers.

Defense counsel also argues that "[g]ang membership alone . . . does not provide sufficient reasonable suspicion." *United States v. Hernandez*, 2011 WL 42875, *5 (N.D. Cal. Jan. 11, 2011) (Alsup, J.) This is true. In *Hernandez*, the officer "admitted that he relied almost entirely on . . . atmospherics [the fact that it was a violent year in the Mission] and defendant Hernandez's alleged gang membership to justify the frisk." *Ibid.* That is not the case here. Reasonable suspicion was based on the officers' observation of defendant Babers engaging in movements known to them to be consistent with movements of an individual attempting to discard or distance themselves from contraband. Additionally, viewing the totality of the circumstances and considering their own knowledge of defendant Babers, his associates, and the district in which the scene occurred, as officers are permitted to do, the officers' concluded there was reasonable suspicion that criminal activity was afoot.

Considering "the totality of the circumstances — "the whole picture," — the officers had reasonable suspicion to suspect that the defendant was engaged in criminal activity. Our Supreme Court has instructed that a "determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois*, 528 U.S. at 125. Defendant Babers', a known convicted felon, BNT associate, and suspect in a robbery case, made a furtive movement immediately after acknowledging the officers' presence. He reached to his waist line, bent over, dropped an unidentified object, and walked away from it. This kind of action, in these circumstances, was known to the trained officers as action indicating that an individual was attempting to hide or discard contraband as the officers approached. *See United States v. Sokolow,* 490 U.S. 1, 8–10 (1989). The detention was constitutional.

**3.    ARREST**.

Defense counsel contends, based on the arguments raised on the detention issue, that the officers did not have probable cause to arrest him.  The government bears the burden to show that a warrantless arrest did not violate the Fourth Amendment.  "Absent probable cause, a warrantless arrest is illegal."  *United States v. Ortiz-Hernandez*, 427 F.3d 567, 573 (9th Cir. 2005).  A warrantless arrest is permissible under the Fourth Amendment if "at the time of the arrest, the facts and circumstances within [the officers'] knowledge and of which they [had] reasonably trustworthy information [were] sufficient to warrant a prudent man in believing that the defendant committed an offense."  *United States v. Henderson*, 241 F.3d 638, 648 (9th Cir. 2000) (internal quotations omitted).  Officers must have probable cause at the time of the arrest.  *Wong Sun v. United States*, 371 U.S. 471, 482 (1963).

This order finds that the information available to the officers at the time of the arrest supports a conclusion that they had probable cause to believe defendant was a felon in possession of a firearm.  As described in great detail above, the officers observed defendant Babers, known to them as a convicted felon, acknowledge that the officers were approaching, then immediately touch his waist line with his hand, bend down, and place an unknown object on the ground, and walk away from the object.  Two minutes later, the officers located a firearm in the area where defendant was seen bending over to drop an object.  Upon finding the gun, the officers arrested defendant Babers.

Defense counsel argues that it "defies logic" for the officers to have arrested all seven subjects if they had probable cause to believe our defendant possessed the firearm.  But, as the government points out, several of the individuals with defendant Babers were subject to suspicionless-search clauses, and the officers arrested them to determine "if there was a conspiracy to possess the firearm in furtherance of their gang activities" (Axelbaum Exh. A at 7).

Here, the officers' discovery of the gun in the area where they observed defendant Babers bend over and drop an object, with the officers' knowledge of defendant Babers, and the officers' previous observations of Babers at the scene, constituted sufficient probable cause to justify a

11

warrantless arrest of defendant Babers. This is not a case where there is "mere propinquity." The arrest was supported by probable cause.

### 4. SUPPRESSION IS NOT WARRANTED.

Evidence seized as the result of an illegal seizure is the "fruit of the poisonous tree" and should be excluded. *Wong Sun*, 371 U.S. at 484–85. Because the detention and arrest were lawful, suppression is not warranted here. Thus, the court need not reach the governments' secondary arguments of inevitable discoverability or that the exclusionary rule should not be applied to this case.

### CONCLUSION

For the reasons stated above, defendant Babers' motion to suppress is **DENIED**. A status conference will be held at **2 P.M. ON TUESDAY, NOVEMBER 8, 2011**.

**IT IS SO ORDERED.**

Dated: October 31, 2011.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE